The next case, which is Coalition for ICANN Transparency v. Verisign. Good morning. May it please the Court. My name is Brett Fawcett. I'm counsel for the Coalition for ICANN Transparency, CFIT. CFIT is a Delaware nonprofit corporation formed for the purpose of bringing the present action and challenging Verisign's unlawful conduct. CFIT is composed of two categories of members. The first category are domain name registrants. These are individuals and companies who have registered domain names in the .com top-level domain and who have been harmed by Verisign's unlawful price increases. The second category of members are what I will call back-order service providers. These are companies that are currently engaged in a vibrant market for selling expiring domain names. These are companies that will be harmed by Verisign's plans to usurp that market, replacing Verisign in the place of these companies. I'd like to reserve five minutes for rebuttal. I'm going to talk about the issues before the Court in two categories. First is .com pricing, and the second is the aftermarket, that expiring domain names market that I talked about. It's important to remember that this case comes to this Court on a motion to dismiss. Well, that's my question. I was not clear about what the procedural posture of the case was. So before we so can you tell us? There had been some discovery, and the Court looked just at the pleadings, or was there other material before the Court? The posture of the case as it comes to you. No, as it came when the district court ruled. The district court ruled solely on the complaint. There was discovery that was granted as soon as the case was filed. CFIT, my predecessor counsel, asked for emergency discovery, warming up to a temporary restraining order. There was a briefing schedule set for that. Circumstances changed. ICANN, the Internet Corporation for Assigned Names and Numbers, who we'll talk about a lot today, deferred their decision on the .com approval for a period of time. That took the emergency off. That motion was never argued. There was some emergency discovery granted in the first week of the case. That was not the posture, though, when the case came to the district. Did the district judge consider any of that information discovered during that brief period in his ruling on the Welby 6 motion? No. Okay. So this case comes to the Court on a motion to dismiss. And as we've argued in the brief, we believe we have met both pre-Twombly standards and post-Twombly pleading standards for antitrust claims. I mention that because the Supreme Court's decision in Twombly was decided a couple of months after the district court ruled. I don't know how the Court will think about this case, but I guess one possibility is that it decides that we have met the pre-Twombly standards, but perhaps we didn't meet the post-Twombly standards, in which case I think the remedy is to reverse and allow us to replead. But I think, I'm going to argue to you today, that we've met both standards. Well, here is my question. I thought that you were given opportunities to replead. We were given opportunities to replead. But it was before Twombly was decided. Correct. But I thought the Court asked you to allege what the predatory conduct was. And we did. And what the Court did in looking at the conduct that we alleged was to not view the pattern of behavior that we alleged. We alleged many different pieces of conduct over a seven-year period. The Court looked at several of them in isolation and said that's not enough, but didn't look at the whole pattern of conduct. More importantly, I think, is that the contract that we're talking about that actually gave Verisign the ability to raise prices was signed pursuant to a settlement agreement with ICANN. The settlement agreement with ICANN, and we pleaded this at paragraph 276 of the second amended complaint, was not mentioned by the district court at all in its opinion. But it basically says Verisign agrees that effective immediately upon the execution of this agreement, it will not participate in, contribute monies for, encourage or provide other support for any activities by third parties that seek to undermine ICANN's role, and it will immediately cease such ongoing activities. So here we have a settlement agreement that forced Verisign to stop its unlawful abuse of the ICANN. But wait a minute. You just added the word unlawful. The agreement says we won't do it anymore. The agreement doesn't say we're no longer going to engage in our predatory unlawful conduct. You've added that characterization. Sure. Yeah. Yeah. But this is a motion to dismiss. So I think my characterization is the one that carries the day. Well, but no, your characterization may or may not. Here's a question I've got. Your complaint and your various causes of action alleged talk both about .com and .net, but it seems to me that your allegations are much stronger as to .com. Are you serious about the .net as well? Does this say there's some rebidding for .net that there never was for .com, and according to your allegations, there never will be as to .com? I'm serious about .net, but I think the facts are much stronger on .com. Uh-huh. I mean, because I'm not sure you've made enough out as to .net. I'm sorry? I'm not sure you've made enough out in your allegations as to .net. Even if you have as to .com. .net was a slightly different circumstance. At one point it was put out for a rebid, and then the contract terms were made the same as the .com agreement. So the contract terms for .net are now identical to the contract terms for .com? Correct. Including the 7% per year? I'm not sure that there's any cap on .net. That could be one material change. But one of the reasons that I think .net is mentioned so prominently in the complaint is not because what it says about .net, but what it says about Verisign's behavior with .com. Because when .net was put out for a level playing field competitive rebid, Verisign lowered its price. What it has done with its conduct here is insulate itself from any future competitive rebid for .com. Let me ask you about your theory with respect to agreement in restrictive trade. How am I supposed to regard ICANN, which looks like both a victim and a, in your view, it's both a victim of all these predatory practices, but at the same time it's a co-conspirator. Correct. Can it be both? Yes, it can. I mean, you can be an unwilling co-conspirator. You can be coerced into behavior that if you were not coerced into, you wouldn't do. And I think that's what happened here. And I think that's that provision that I just read that we pleaded in the complaint. I think that's what it says. What is the coercion? The coercion is over, it's a long history here, but starting almost immediately from the time that ICANN and Verisign entered into a relationship where the ICANN was going to be the overseer and Verisign was going to run the .com registry, Verisign has been trying to get better terms through lying about who it was. It hired people under false identities to post things to the ICANN comment boards to criticize ICANN. It used its superior financial pressures to constantly cause ICANN staff to be paying attention to Verisign, to under threat of personal liability to its officers and directors. At one point ICANN had to file an anti-slap suit against Verisign that was actually never resolved because of the settlement agreement. Just a continuous abuse of the process. And not just as you'll hear from counsel, you know, we were just playing the ICANN game better than other people. I mean, they were lying about who they were. They were committing fraud. These are things that we've talked about in the complaint. So it was a continuous use of superior resources for to gain a contract that now generates for Verisign half a billion dollars a year. Certainly the financial incentives were there, and as we described in the complaint, they did everything, even things that were impermissible and even things that were Let me ask you about the expired.com names. It looks to me as though that part of your complaint, you're looking at a contemplated action by Verisign rather than a completed action. And are you just after an injunction there? What's going on with respect to that? We don't wish Verisign to enter that market. We want Verisign to leave the market as it is. That is to say you're simply after an injunction as to that part of your complaint. Correct. Verisign has expressed an intention to launch something called the Central Listing Service that will make all expired domain names go through Verisign, and it will essentially put our member companies that are backorder service providers out of business. The district court did not agree with our market definition on that. The district court said that currently registered names were interchangeable with expired domains, so that expired domains weren't really its own market. I liken that to thinking that there's no market for used cars because of all these people out on the streets driving around cars that are reasonable and interchangeable with them. Currently registered names aren't for sale, so they can't be reasonably interchangeable with expired domains, as the district court found. Well, there's a great deal of explanation as to the economic use of expired domain names that's different from currently registered names in the amicus brief. Part of my question is, is that explanation sufficiently contained in your complaint? I believe so. I mean, we talked about all the differences. I mean, these are on page 51 of our opening brief, but we talked about the fact that the markets are serviced differently, they're priced differently, they're valued by consumers differently, and they have all these different attributes. So, I mean, I think we've adequately hit that in the complaint. So on the question of remedy, with respect to the expired, expiring names, the remedy you want is an injunction against what? We want an injunction before this Court or the district court? The district court. The district court, we are asking for an injunction against Verisign to prevent it from entering this market, which it is not now in. But it has the technical power to prevent expiring names from becoming available to our clients, our members, and essentially push them out of the market entirely. It will be a sole service provider in a currently competitive market. And then with respect to the other claims, what is the remedy that you want? We want to ask the district court for a rollback of the price increases. We want to ask the district court for a rollback of the provisions in the agreement with ICANN that allow Verisign to have the DOTCOM contract in perpetuity without a competitive level playing field rebid. The original agreement in 1999 gave Verisign no preference at the rebid. Would have required a competitive rebid. Would have allowed prices to drop to market rates. We want a rollback to that provision. Okay. I understand the competitive rebid. The pricing increases rollback. How is that attributable? Verisign only got those provisions because of the predatory conduct. Verisign ---- The predatory conduct being what, the bribes and stuff, or what? There were no bribes. We've not alleged bribes. All right. What is the predatory conduct that's alleged in the complaint? It is a combination of financial rewards to ICANN. ICANN, Verisign's conduct at some point almost put ICANN on the brink. It's the financial rewards. Yeah. Well, first of all, pushing it to the brink of extinction. Pushing it to the point where, through the threat to withhold financial support, to the point where it might have gone out of business. Completely disrupting the regulatory environment for the DNS. ICANN. ICANN. And then saying, okay, we won't do that, but now we'll give you a lot of money. And so that was one component. There's also this component of constantly, you know, presenting itself and others that it paid to come to ICANN meetings and advocate for Verisign interests. Not revealing that they were Verisign paid employees. You know, stacking this regulatory process. I've got just a minute left, so I'd like to reserve it for reply. Thank you. Thank you. Good morning. Ron Johnston for Verisign Corporation. CFIT asked this Court essentially to rewrite the terms of two agreements that were negotiated over a period of over a year with the Department of Commerce and ICANN. The two agreements are, number one, the cooperative agreement, which is an agreement between Verisign and the Department of Commerce, that incorporates into it almost all of the terms of which CFIT complains of here, including the pricing and renewal terms. And CFIT also seeks to prevent performance of the registry agreements between Verisign and ICANN. As to your first point, how active was the Department of Commerce in, you say, negotiating these contracts? My impression was, at least according to the allegations in the complaint, that the negotiating parties entering into these contracts were Verisign and ICANN. The negotiations proceeded in two stages. There were negotiations first with ICANN, pursuant to which terms of a registry agreement were roughed out or decided. There was an Internet community comment on that. Then those agreements were taken to the Department of Commerce. What followed was approximately a full year of investigation and consideration with the Department of Justice, the Department of Commerce, subcommittees within Congress, and other Federal administrative agencies who have oversight responsibilities. The terms of the agreement that CFIT complains of, the pricing term, the renewal term, all are contained, incorporated into the cooperative agreement that was ultimately executed with the Department of Commerce. And, in fact, for the first time in the history of the operation of the registries and the cooperative agreement is a provision that says upon renewal, the Department of Commerce must approve the renewal as in the public interest and in considering whether the renewal is in the public interest, the Department of Commerce will consider the pricing of services during the period of the agreement, the investment in the infrastructure, the compliance with consensus policies. Now, is all this in the complaint? All of this is incorporated into the complaint by virtue of the agreements and other materials that CFIT referred to and incorporated into the argument before the district court. So all of the agreements were before the district court, including the cooperative agreement, and including press releases that CFIT put before the court to show that this had gone on for over a year. Now, in spite of all that, I suppose it's more than a curiosity, but the agreement says, you know, very carefully say that there's no antitrust immunity or exemption provided by the agreement, right? Correct. Why would they put that in there? Often in connection with oversight or regulatory legislation or agreements, there are immunity clauses or on the one hand or savings clauses on the other. And here what that provision means in our view is that if you violate the antitrust laws, Verisign, you can be held accountable. What it can't mean is that this agreement violates the antitrust laws because this agreement was explicitly approved as in the public interest by that same document that includes the savings clause. No, but it could mean that, you know, in approving this agreement, we aren't passing on the antitrust aspects. Can't it mean that? It could mean that. On the other hand, the agreement itself says that it's in the public interest. Can I interrupt for just a minute? Sure. I read the language and I'm trying to find it again. Can you put my nose in the precise language? On the cooperative agreement, on the immunity? The language that says, in effect, we're not insulating this from an antitrust challenge. Yes. That is in the cooperative agreement. Excerpts of record 133. Excerpts 133. Okay. I've got it. It's paragraph 322 of the complaint. Now, the ---- Okay. 130. You know, there was a very similar clause before the Supreme Court in the recent case of Verizon v. Trinco. It was a savings clause indicating that the legislation would not mean or the regulation would not mean that there is immunity. Nonetheless, the Supreme Court indicated that in terms of assessing the industry and the potential competitive impact of actions, the court is to consider the regulatory or oversight environment. That is very important here for two reasons. Any renewal has to be approved by the Department of Commerce. Thus, there have been no facts alleged as to how the renewal terms or the continuing renewal could ---- Now that I've got the language in front of me, I want to just read it. It says, This approval is not intended to confer federal antitrust immunity on VeriSign with respect to the registry agreement. That is to say, look, to me as though it says, This agreement we're not passing on as to whether it does or does not violate the antitrust laws. I think that's how I read that. Correct. I agree with that. That doesn't sound like what you were arguing. What I'm ---- My argument is that it can't mean that the agreement itself is a violation of the antitrust laws. Well, I think it can. I think that's exactly what it does say. It says it could be, it couldn't be. We're not saying whether it is. You're right. I agree. There's no dispute as to that. There's no ---- We do not say that there's immunity here. We've never contended that there's immunity here. But by the same token, we don't believe that that savings clause means that there is a violation of the antitrust laws. And, in fact, we don't believe there's any facts alleged here that could constitute predatory conduct or injury to competition in violation of the antitrust laws. The sum and substance of the allegations in this case is that the Department of Commerce and ICANN determined that they were going to allow unilateral price increases within a cap. Under established cases, the Trinco case in the United States Supreme Court, the Alaska Airlines case before this Court, unilateral prices ---- Well, no, no. Wait a minute. I think in fairness to the complaint, it's more than unilateral because the complaint really alleges that ICANN did all this because it was compelled to do so by Verisign. So it's hard to say it's unilateral in the sense that it doesn't have anything to do with all this activity by Verisign. That's not the burden of the complaint, is it? I believe that it is the burden of the complaint to show that there's something more than unilateral action. And here the only person to the agreement was ICANN, which is not an economic actor. ICANN is purely a technical oversight body that provides oversight pursuant to the mandate of the Department of Commerce. That mandate is set forth in a memorandum of understanding. ICANN then provides oversight to Verisign under the registry agreement and provides reports to ICANN. The allegations of aggressive conduct could not provide a basis for an antitrust violation here because of the immunity doctrine under the Knorr case. Specifically, I think the suit as well as the other actions here. But the purpose of the other actions is to induce, as alleged in the complaint, to induce government action in the EU and the United States to undermine ICANN's authority. Now, that is a public question. You know, there's a lot of argument as to whether ICANN is a public or private entity for purposes of antitrust law. And I don't think it's at all established that ICANN is the equivalent of a governmental actor. Rather, it seems to me the case law to the extent there is, it goes the other way. I don't think there's any case law on that issue. ICANN is a non-profit. ICANN sells no goods or services. ICANN provides its oversight under direct control of the Department of Commerce. Non-profit doesn't mean it doesn't take in money. True. But taking in money doesn't mean that the agreement here would be with an economic actor such that it would be anything more than a non-profit. You're not arguing that a non-profit entity cannot violate the antitrust laws, are you? No. Okay. But there's also recent – there's also some recent Supreme Court cases on authority on what is government and what isn't that may be relevant here. But here's what I'm not understanding. The agreement itself says that it's not – that it's not necessarily any kind of a – doesn't have any expression of opinion as to the – whether the agreement violates the antitrust laws. If I understood the argument this morning, and if I understood what was troubling what may have been troubling the district court is the question of what is predatory about all of this. Now, if I understood the argument this morning, it was that if not the provisions of the contract themselves are a violation, because we – it seems to me we have a kind of a natural monopoly here anyway, but that the manner in which the agreement was forced or coerced is an antitrust violation. Now, if you assume for a moment that there's no protection under Norr Pennington here, let's just assume that, what is your argument with respect to the predatory nature of the allegations that we heard this morning that may or may not completely be in the complaint as to the coercion about this? For the – for the coercive actions, in our view, to have antitrust significance, they would have to have produced an agreement that had antitrust significance, that violated the antitrust laws. And here this agreement, in our view, does not violate the antitrust laws because the provisions of this agreement do not restrain competition unnecessarily and instead represent conduct, whether it's an alleged monopolist or not, that is, conduct of a verisign pursuing its independent economic interests, which even an alleged monopolist is allowed to do. So the resulting agreement does not violate the antitrust laws. So someone getting a – obtaining a contract that others think they would have liked to get, but who does so on the basis of whatever means it chooses, that that's not antitrust-protected activity, are these people really competitors with verisign in that sense? I'm not sure I understand. Well, the – there's two kinds of allegations that are made by the plaintiff. And one is that I believe other registries or potential registries would have come in at the time of a rebid if there was a rebid and renewed. The other allegation is that there's potential competition in this expiring domain names market as they allege it. With respect to the first, there can only be one registry. So in the sense of the alleged market, there's never been a change in market position of verisign or market concentration. Historically, there was a presumptive right of renewal starting in 2001, an agreement they have admitted in their original complaint is pro-competitive. That agreement said it shall be renewed absent certain conditions. And the reason for presumptive renewal is the requirement for the investment in a huge infrastructure that's critical to security and stability of the Internet and the need to have the person making those hundreds of millions of dollars investment in security and stability knowing with some certainty that the franchise isn't going to suddenly disappear and that investment lost. Well, let me ask you this. Are you making an argument that this is a natural monopoly? Let's start with that question. I would argue that this is a monopoly by necessity of the way the Internet is run. And to me, that's a natural monopoly. Now, it's a natural monopoly over time or is it merely a natural monopoly during the period that verisign or someone else has the contract? As you say, it seems to me it's clear that you want one entity administering dot com. Right. But is it clear in the sense of natural monopoly that once somebody starts to do that, that it must remain that same person and it cannot be set up for rebid? It could be set up for rebid under certain conditions. The Department of Commerce has decided that those conditions have to be fairly limited because otherwise you can't expect the registry. In the 2001 contract, was one of the conditions for rebid was a request to increase prices? Yes. Is that now gone from the 2006 contract? That is not a condition in the 2006 contract. Your answer is that that is now gone? It is gone for the reason that under the 2006 contract, it was decided that verisign needed the ability to increase prices during a term. It was decided, sounds like passive voice, who decided? The Department of Commerce decided that. Did the Department of Commerce approve that agreement already entered into between verisign and ICANN? The original agreement had a very different pricing provision. The pricing provision was renegotiated between the Justice Department, Department of Commerce, and verisign and included in a different form in the cooperative agreement executed between verisign. Is the course of negotiation, not the contract itself, but is the course of negotiation in the record or is it in the complaint or is it in some place that the district court could legitimately have taken account of? It is in the record in this sense. It is in the record in the sense that those pricing terms are part incorporated into, expressly set forth in, and directly enforceable. The ultimate pricing terms? Yes. But I'm asking about the course of negotiations. You said the pricing terms were different when initially negotiated and they were changed during the course of negotiation, inserted basically because the Justice Department or the Department of Commerce wanted it. Is that in the record or is that in the complaint? Not directly. Okay. One could conclude that from the record, but it's not. So you might, once the record is developed, have a defense that, well, this contract really wasn't a product of the agreement between verisign and ICANN at all. It was the government that did this. Well, I don't think it matters from an antitrust point of view which way it goes, because the agreement to allow verisign to exercise some price decision-making during the term of the registry agreement, which is part of both the cooperative agreement and the registry agreement, is in the record and under the antitrust laws. If it's unilateral, it's lawful. Here, the only variation from it being purely unilateral is that there was an agreement with the oversight body to allow that to happen. Other courts have found that that doesn't change price flexibility from unilateral conduct, including in cases of the law. I'm sorry to interrupt, but we're running. I think you're over time. Are we supposed to take as true as the case is now in front of us that if this were put out for a rebid, the price would be at least as low as $3 per name instead of 6 plus 7 percent a year? There's nothing in the record that establishes what the price on the rebid would be. Well, it's in the complaint. The complaint says it would be as low as $3. Right. So that's what we're supposed to assume. That's irrelevant under the antitrust laws. Our view is that the antitrust laws don't look at results. Right. Antitrust laws look at process and structure. And that's very clear from the Supreme Court's decision in Verizon v. Trinco. The fact that some competitors may not be in the market, the fact that there may not be a bid that takes place is not unlawful unless there is predatory conduct, which is conduct that can only be justified as an attempt to reduce competition as opposed to having any profit-making natural incentives promoting the conduct. And what do you understand to be the allegation here of competitive injury? I consider it twofold. There's kind of separate claims, I think. Yes. One, with respect to the pricing, is that as a condition on the renewal, that if Verizon wanted to increase prices, it would have to be sent out for bid, and it would not have to be sent out for bid. ICANN would have the right. It wouldn't have to. The right to send it out for bid. Okay. The other competitive injury is alleged with respect to the expiring domain names market.  I understand. But I think there's an important point here I'd like to conclude with under the Verizon versus Trinco case. And that is that when you have a government regulation or oversight, that is a policy decision, such as in these original agreements. That is a different decision from what the antitrust laws provide or not. And it would be dangerous to conflate those two, because if you started with the proposition that the original agreements were the law, and the change in agreements, if it affects competition, is unlawful, then you potentially interfere with achieving the results of the regulatory objectives. Here those objectives are very profound. They deal with security, stability of the Internet, and investment of the infrastructure. And that is the reason why these terms were delicately negotiated over a long period of time. Now, whether they're delicate, I agree with Judge Fletcher, is not in the record, nor is it critical to our argument. Okay. Thank you. I know our time is short, but I think I'm going to be quick. I don't know that it makes a difference at the end of the day, but ICANN actually does provide services, provides something known in the technical community as root services. It updates the root zone, which tells the Internet what top-level domains exist, com, net, org, what have you. It also generates close to $50 million a year in registry fees taken from registrants, registrars, and registries. The second point I want to make is that you can't divorce the conduct that led to these agreements from the agreements, as counsel would like to do. That's what Allied Tube instructs. That's talked about at pages 33 through 35, that the conduct that reaches these unlawful agreements has to be looked at with the agreements. Third point I want to address is natural monopoly. We amended the second amended complaint specifically to address concerns about natural monopoly and the district court's prior opinion. We added for the first time paragraphs 62 through 66 of the second amended complaint that's at the excerpts of record at 99 and 100. Those new provisions were not mentioned at all by the district court in its decision that dismissed the cause of action with prejudice. These are the allegations where we talk about the fact that just because it is preferred to have one company at a time operating.com does not mean that you're a natural monopoly, because you still, when you have a contract for a period of term, face competition from your successors, because you know that at some point the contract is going to be put out to rebid. We think that that kind of arrangement, serial contracts, is not a natural monopoly because you're always facing competition at the expiration of your contract term. Is there anything in the complaint or something else I can look at properly with the case in this posture as to how much investment Verisign or someone in Verisign's position has to make in capital servers and so on in order to perform under the contract? I mean, I just heard hundreds of millions of dollars. I'm trying to figure out if there's someplace I can look to figure that out, whether that's actually true. We haven't pleaded it. We did plead that there was an agreement in a prior contract that said that Verisign had to invest $200 million in infrastructure. That was taken out in the most recent contract, so now it's left to Verisign's discretion as to how much it invests. Presumably the investment, the argument is investment's been made. It's a whole lot of money. I'll tell you that. But remember that Verisign also makes half a billion dollars each year from .com, and it's a lot less than that. And there's nothing in the record that tells us, let's say Verisign, I'm making up this number, let's say Verisign has spent a half a billion dollars in capital, whatever it is, there's nothing in the record that tells us whether if they lose the contract they might be able to sell that to somebody else for $300 million. I don't know. There's nothing in the record that I'm aware of. Okay. I mean, I think importantly, if you put it out to Rebid, some other company, some new competitor's infrastructure may be different than what Verisign says. But I think we really won't find out about the margins and the costs until we actually let other people try to do what Verisign's doing now. Okay. Last point. We heard a lot about the Department of Commerce. The district court's decision did not turn on that. It was not in there. A lot of the things we heard from counsel about where things were approved and the Department of Commerce's involvement, that's not in our complaint. That's not properly before the record. It sounded a lot like the sort of factual issues that I would love the opportunity to address, but back in the district court after the case is reversed and remanded. I have nothing else if the panel has questions. Thank you for your time today. The case just argued is submitted for decision.
judges: Schroeder, Tashima, Fletcher